IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 23-cr-00302-NYW

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. MARK PERLSTEIN, and
2. MICHAEL VERGATO,

    Defendants.

## INDICTMENT

The Grand Jury charges:

## **COUNTS 1 - 6**

1. Between in or about January 2014 and in or about June 2020 defendants MARK PERLSTEIN and MICHAEL VERGATO devised and intended to devise a scheme to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises.

2. At times relevant to the scheme, MARK PERLSTEIN was the CEO and President of a company located in Colorado identified herein as "DV Corp", a database application, and analytics service provider.

3. At times relevant to the scheme, MICHAEL VERGATO was an employee and Vice President of a corporation identified herein as "ARW." ARW was a Fortune 150 company which describes itself as a provider of electronic components and engineering support for computer systems and technology platforms. DV Corp

contractually provided services to ARW, and ARW was one of DV Corp's largest sources of revenue.

4. MICHAEL VERGATO caused the creation of an entity named Oracle Performance Tuning and Optimization, LLC, (hereinafter OPTO) which was registered with the New York Secretary of State on or about November 15, 2013.

5. As a part of the scheme, between in or about January 2014 and in or about September 2019, OPTO sent invoices to DV Corp for work purportedly performed by OPTO for DV Corp. These invoices totaled over approximately 1.9 million dollars. Between on or about January 2014 and September 2019, DV Corp paid OPTO over approximately $1.9 million dollars. OPTO had no clients or customers other than DV Corp.

6. As a part of the scheme, OPTO invoices sent to DV Corp were sent directly to the DV Corp corporate email address of MARK PERLSTEIN, rather than to an accounts receivable department at DV Corp. The OPTO invoices were sent from an email account c_vicari@oracleperformancetuning.net and purportedly sent by a person identified herein as CV, who was identified in communications as the Director of Operations at OPTO. MARK PERLSTEIN caused DV Corp to pay the invoices.

7. As a part of the scheme, between in or about January 2014 and March 2016, a company referred to herein as MSC sent numerous invoices to OPTO purportedly for services rendered to OPTO by MSC in a total amount of approximately $357,920.00. MSC's owner was MARK PERLSTEIN's brother-in-law and is referred to herein as "EK." MARK PERLSTEIN directed EK to create and provide invoices

reflecting billing to OPTO for services performed by MSC. MSC provided no services to OPTO. MSC stopped sending invoices in March 2016.

8. OPTO paid the aforementioned invoices sent to it by MSC even though MSC provided no services to OPTO. Checks drawn on a financial institution account of OPTO payable to MSC were purportedly signed by CV and sent to MSC. CV did not sign the checks. After MSC stopped sending OPTO invoices in or about March 2016, OPTO continued to send payments to MSC on a regular basis until in or about April 2018. Between on or about January 2014 and March 2018, OPTO paid MSC approximately $699,912.00.

9. Between on or about January 2014 and April 2018, MSC wrote checks on its account in an amount totaling approximately $627,660.00 to MARK PERLSTEIN. Those checks were deposited into accounts controlled by MARK PERLSTEIN.

10. As a part of the scheme, between on or about September 2018 and October 2019, OPTO paid Physical Cloud, LLC approximately $376,500.00 by check. MARK PERLSTEIN formed Physical Cloud, LLC with the Colorado Secretary of State in September 2018. MARK PERLSTEIN was the sole authorized signor on Physical Cloud, LLC's bank account where the OPTO checks were deposited.

11. OPTO invoices to DV Corp were no longer sent after the fall of 2019. In or about the fall of 2019, MARK PERLSTEIN was placed on administrative leave at DV Corp. He was terminated from DV Corp in January 2020.

12. As part of the scheme, MARK PERLSTEIN received approximately $1,004,160.00 from the DV Corp payments to OPTO described above. The remaining

funds from DV Corp paid to OPTO, approximately $872,611.00, went to the benefit of MICHAEL VERGATO.

13. Because ARW was a client of DV Corp and because MICHAEL VERGATO was ARW's main contact with DV Corp, it was part of the scheme that MICHAEL VERGATO and MARK PERLSTEIN acted to have the involvement of MICHAEL VERGATO as a person who controlled OPTO hidden from both DV and ARW. In furtherance of this goal, the following steps were taken, among others:

    a. MICHAEL VERGATO created OPTO and used the name of his stepdaughter, an individual who did not have the last name "Vergato," as an individual participating in the creation of OPTO. Her name was CV, the same identity referenced in paragraph 7.

    b. MICHAEL VERGATO, acting on behalf of OPTO, and MARK PERLSTEIN, acting on behalf of DV Corp, communicated with each other via email with MARK PERLSTEIN using his DV Corp email account and with MICHAEL VERGATO using an email address purportedly in the name of CV, c_vicari@oracleperformancetuning.net.

    c. MICHAEL VERGATO purportedly communicated with MARK PERLSTEIN and others on behalf of OPTO using the name of CV as the author of or as a signatory on emails, proposals, statements of work, other communications, invoices, and bank documents.

    d. MICHAEL VERGATO caused the signature of CV to be placed on documents issued by OPTO and on checks drawn on an OPTO savings and loan account.

e. In June 2020 MICHAEL VERGATO, while an employee of ARW, was interviewed by agents of ARW who were investigating his relationship to OPTO and between him and MARK PERLSTEIN and what was believed by the agents of ARW as false invoices issued by OPTO to DV Corp and payments from DV Corp to OPTO. In furtherance of that effort, MICHAEL VERGATO, denied his managerial role in OPTO and disavowed participation in or knowledge of the scheme described herein, or of the actions which are described herein. He resigned from ARW that day.

f. In the summer of 2020 MARK PERLSTEIN, was interviewed by agents of DV Corp and ARW who were investigating the relationship between him, MICHAEL VERGATO and OPTO and what was believed by the agents as false invoices issued by OPTO to DV Corp and payments from DV Corp to OPTO. MARK PERLSTEIN, in an effort to continue the cover-up, disavowed participation in or knowledge of the scheme described herein, or of the actions which are described herein.

14. On or about the dates listed below, in the State and District of Colorado and elsewhere, MARK PERLSTEIN and MICHAEL VERGATO, directed and caused wire transfers to be received at an OPTO account at Suffolk Federal Credit Union (SFCU) which had been sent from DV Corp and in so doing caused writings, signs and signals to be transmitted by means of wire communications to be sent in interstate commerce for the purpose of executing the aforesaid scheme and artifice to defraud as listed below:

| Count | Date | Amount |
|-------|------|--------|
| 1 | 09/19/2018 | $ 152,064.00 |
| 2 | 01/03/2019 | $60,000.00 |
| 3 | 02/19/2019 | $85,000.00 |
| 4 | 04/17/2019 | $60,000.00 |
| 5 | 05/21/2019 | $60,000.00 |
| 6 | 09/04/2019 | $147,551.00 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

### FORFEITURE ALLEGATIONS

15. The allegations contained in Counts 1-6 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section § 2461(c).

16. Upon conviction of any of the violations alleged in Counts 1 – 6 of this Indictment involving the commission of violations of Title 18, United States Code, Section 1343, Wire Fraud, defendants Mark Perlstein and Michael Vergato shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c) any and all of the defendant's right, title and interest in all property constituting and derived from any proceeds the defendants obtained directly and indirectly as a result of such offenses, including, but not limited to, a money judgment in the amount of proceeds obtained by the defendants.

17. If any of the property described above, as a result of any act or omission of the defendant (a) cannot be located upon the exercise of due diligence, (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the

jurisdiction of the Court; (d) has been substantially diminished in value; (e) or has been commingled with other property which cannot be subdivided without difficulty it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

A TRUE BILL:

<u>Ink signature on file in Clerk's Office</u>
FOREPERSON

COLE FINEGAN
United States Attorney

By: <u>*s/Robert Brown*</u>
ROBERT BROWN
Assistant U.S. Attorney
1801 California St., Ste. 1600
Denver, CO 80202